PEOPLE v. PALLISTER

1. CRIMINAL LAW—CONFESSIONS—ADMISSIBILITY—REVIEW.
   Court of Appeals must make an independent examination of record to determine whether a criminal defendant's confession is voluntary whenever such voluntariness for purposes of admissibility is placed in issue.

2. SAME—CONFESSIONS—ADMISSIBILITY.
   Admitting into evidence confession of defendant made on 6th day of incarceration after arrest and as a result of promises and inducements by law enforcement officials was reversible error.

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 590.
[2] 29 Am Jur 2d, Evidence § 543 *et seq.*
[3] 29 Am Jur 2d, Evidence § 539 *et seq.*

3. SAME—CONFESSIONS—CO-DEFENDANT.

> Prosecutor's reading a co-defendant's confession which named other co-defendants at joint trial immediately before allowing him to plead guilty to lesser charge was so fundamentally unfair as to justify a new trial on that ground alone, even though no error was assigned on that ground.

Appeal from Oakland, Ziem (Frederick C.), J. Submitted Division 1 April 3, 1968, at Detroit. (Docket No. 629.) Decided October 25, 1968.

Marvin Pallister was convicted of armed robbery. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *S. Jerome Bronson,* Prosecuting Attorney, *Patrick H. Oliver,* Chief Appellate Counsel, and *Richard S. Rossman,* Assistant Prosecuting Attorney, for the people.

*Roman S. Gribbs,* for defendant on appeal.

VANDER WAL, J. Defendant Pallister and two co-defendants, Dorothy Krugman and Gerard Flieger, were jointly charged with armed robbery[1] perpetrated on December 1, 1962. The three defendants were tried jointly before a jury. Defendants Pallister and Krugman were found guilty. Defendant Flieger pleaded guilty to a lesser offense during the trial. Defendant Pallister was sentenced to imprisonment for a period of eight to 25 years.

Defendant Pallister requests that the judgment of the trial court be reversed and that he be discharged or, in the alternative, a new trial be granted.

---

[1] Contrary to CLS 1961, § 750.529 (Stat Ann 1968 Cum Supp § 28.797).

Defendant raises three issues, but because of our holding on the second issue, we need not consider the other two.

Did the trial court commit reversible error in admitting into evidence the confession of the defendant made on the sixth[2] day of incarceration after arrest and as a result of alleged promises and inducements by law enforcement officials?

The United States Supreme Court has declared that where the voluntariness of a confession is put in issue the Court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness". *Davis* v. *North Carolina* (1966), 384 US 737, 741, 742 (86 S Ct 1761, 1764, 16 L Ed 2d 895, 898). See, also, *Greenwald* v. *Wisconsin* (1968), 390 US 519, 521 (88 S Ct 1152, 1153, 20 L Ed 2d 77, 79). On the authority of earlier such statements by the United States Supreme Court, the Michigan Supreme Court has ruled:

"No longer, our alternative task being that of determination whether Hamilton's confession was admissibly voluntary as a matter of federally guaranteed due process, may we escape the duty of independent examination of the record; apart from fact-findings below." *People* v. *Hamilton* (1960), 359 Mich 410, 418.

Accordingly, we have made our own independent examination of the record. We are left with the "definite and firm conviction"[3] the trial judge erred in holding that the defendant's confession was vol-

---

[2] The arresting officer testified that the arrest was made on March 20, 1963. The statement of defendant was dated March 25, 1963. Defendant testified (see below) that 12 days elapsed between arrest and confession.

[3] See *United States* v. *United States Gypsum Co.* (1948), 333 US 364, 395 (68 S Ct 525, 92 L Ed 746); 2 Honigman and Hawkins, Michigan Court Rules Annotated (2d ed), p 595 *et seq.*

untary and, accordingly, have concluded that the trial judge's finding of voluntariness was clearly erroneous. GCR 1963, 517. We have considered but see no need to decide whether the trial judge should have applied the preponderance of the evidence or reasonable doubt standard in evaluating the evidence concerning voluntariness,[4] because in our view applying either standard the trial judge should have concluded the confession was involuntary.

Pallister testified he was induced to make the statement because of intimations that if he would do so he would be given the opportunity to plead to a lesser charge, his bond of $10,000 which he could not make would be reduced to a figure he could make, and "holds" which would justify detaining him even if he raised the $10,000 bond would be overlooked. He testified he had been in jail for 12 days after his arrest on the charge of which he was ultimately convicted, during which period he did not give a confessional statement although frequently questioned. His testimony is supported by the testimony of an attorney with whom he conversed on the telephone before giving the confession and is also corroborated to some extent by other circumstances. We also think it significant that the people did not contradict his assertions by questioning the officers alleged to have made the promise, even though two of them were on the stand and could have been questioned by the people in that regard.

The transcript shows:

"*Q.* And during that 12 days, were there any promises or threats made to you by any law en-

---

[4] *Cf. United States* v. *Inman* (CA4, 1965), 352 F2d 954, with *Clifton* v. *United States* (CA DC, 1966), 371 F2d 354.

forcement officials, whatsoever, if you would voluntarily make a statement?

"*A.* Yes.

"*Q.* What were they?

"*A.* To a lesser charge.

"*Q.* Then insinuated to you that if you came forward and made a statement, that you would be permitted to plead to a lesser offense?

"*A.* Would you repeat that, please?

"*Q.* They indicated to you that if you would make a statement, that you would be permitted to plead to a lesser offense than armed robbery?

"*A.* Yes, also with other stipulations.

"*Q.* What were the other stipulations, please?

"*A.* $10,000 bond, that I couldn't make.

"*Q.* Your bond was set at what?

"*A.* $10,000.

"*Q.* And what did they tell you about your bond?

"*A.* If I didn't make it, they would throw a holder on me for something else.

"*Q.* If you didn't make it?

"*A.* If I didn't—I misunderstood—

"*The Court:* Proceed.

"*Q.* What did they tell you regarding your bond of $10,000?

"*A.* They knew I couldn't make it.

"*Q.* So did they make any promises to you if you made a statement regarding the bond?

"*A.* They would reduce it.

"*Q.* Did they say how low they would reduce it?

"*A.* To around where I could make it.

"*Q.* So your testimony is that prior to the time that you made your statement, you were held approximately 12 days, and you were informed that if you made a statement, that you would be permitted to plead to a lesser included offense or a lesser offense than armed robbery, is that correct?

"*A.* Yes.

"*Q.* And that your bond will be reduced so that you could go home to your parents?

"*A.* Yes.

"*Q.* Was the bond, in fact, reduced, after you made your statement?

"*A.* The very next day, or two days, I'm not sure.

"*Q.* What was the amount of the new bond which was set?

"*A.* $2,000, cash or surety.

\* \* \*

On cross-examination:

"*Q.* What did Mr. Lang [the prosecutor] promise you?

"*A.* Nothing.

"*Q.* Oh, what did Detective George Dreachslin promise you?

"*A.* He said, 'I wouldn't be surprised if you got probation.'

"*Q.* What did he promise you?

"*A.* Nothing.

"*Q.* What did Trooper George Plummer promise you, Marvin?

"*A.* Reduce my bond.

"*Q.* Trooper Plummer promised that he would reduce your bond?

"*A.* He would talk to the people to reduce my bond.

\* \* \*

"*Q.* And Detective Dreachslin didn't promise you anything?

"*A.* He also said—which I said no before, he also would help with the bond.

"*Q.* $10,000, that was your bond?

"*A.* At the time.

"*Q.* How would they do that, go to the judge?

"*A.* Well, they would put in a good word.

"*Q.* With the judge?

"*A.* Uh-huh.

\* \* \*

*"Mr. Wilson:* So it's your testimony that when you were asked the question [by the judge], 'Has anybody promised you anything to get you to talk to me relative to this affair?' That you answered 'yes' then the officer stood up and you said, 'no, I'm sorry.'?

*"A.* Correct."

The testimony of the lawyer, William Hull, with whom Mr. Pallister spoke on the telephone before giving the statement, which lawyer, after talking to the officers told Mr. Pallister, according to the latter's testimony, "Make a statement", corroborates the substance of Mr. Pallister's testimony:

*"Q.* Bill, did you talk to any of the officers or prosecutors handling this case, prior to the time that Mr. Pallister made a statement?

*"A.* Yes.

*"Q.* Was the question of Mr. Pallister's bond discussed at this time?

*"A.* Yes.

*"Q.* Did they insinuate to you that if he made a voluntary statement to them that his bond would be reduced?

*"A.* They stated that they would have no objections to a reduction of the bond, and that they would relate this to the judge that would determine the amount of the bond.

*"Q.* Did they state anything to you about any other holds that they might have on him, on Mr. Pallister?

*"A.* They mentioned that there were other matters under which they felt that they could hold Mr. Pallister.

*"Q.* Did they mention to you the possibility of a reduction in sentence, if he voluntarily cooperated?

*"A.* They said that they would have no objection to any reduction in sentence, *and that they would do what they could to facilitate anything, if it could be arranged.*

"*Q.* And based upon these discussions with the law enforcement officials engaged in this matter, you advised Mr. Pallister that it would be in his best interest to make a statement, is that correct?

"*A. These* and other factors.

"*Q.* Were there any other factors that might be relevant to us here, important to us here today?

"*A.* No, I don't believe so." (Emphasis added.)

On cross-examination the attorney was questioned:

"*Q.* What is reduction in sentence, as you use the term here, Mr. Hull?

"*A.* I don't recall that I used the terminology. I think Mr. Wilson used it.

"*Q.* You said, in your answer, if I may have the answer read back, that they said something to you about reduction of sentence. And I didn't understand.

"*A.* Obviously, it was a mis-statement, *a reduction in the charge.*

"*Q.* Oh, and it's your testimony that you had discussion with these police officers, and there was some possibility of reducing the bond in this case on Mr. Pallister?

"*A.* I testified that the police officers indicated to me that they would have no objection to a reduction in the bond. *And that they would do whatever they were able to as far as discussing the matter with the judge and relating to the judge that they had no objection to a reduction in the bond.*

"*Q.* And that they would talk to the prosecutor about some reduction in the charge?

"*A. They would have no objection to the reduction in the charge.*

"*Q.* They would have no objection. And which officers were these, Mr. Hull?

"*A.* Well, I talked with George Dreachslin, Mr. Olepa, and Mr. Plummer." (Emphasis added.)

Miss Nancy Ballow, the court reporter, was asked how long an interval elapsed between the "yes" and the "no, I'm sorry", to which she replied "seconds".

Mr. George Dreachslin, one of the officers, was called and he was asked on direct examination only with regard to the "yes", "no, I'm sorry" answer. He testified that only a second or two elapsed between the "yes" and the "no, I'm sorry" answer and, in response to a question from the court: "Was there anything done to influence the—Pallister to change his mind?" he replied, "No, sir, absolutely nothing." On cross-examination he was asked whether anybody stood up, and he testified, "I don't remember standing up during the whole time he was giving the statement." He was also asked whether he recalled anyone standing up or flinching or making any motion whatsoever when the answer "yes" was proposed by the defendant, to which he responded, "No, sir, I don't."

The statement was taken on March 25, 1963, at 2:15 p.m. Preliminary examination was conducted March 29, 1963, with Mr. Hull representing Pallister and another defendant. At the conclusion the court stated:

"The court is satisfied and this matter will be bound over on the motion of Mr. Lang. The defendants, Dorothy Krugman, Marvin Pallister and Gerard Flieger will be bound over to circuit court for trial. The arraignment will be set for April 8, 1963 at 1:30 p.m. On motion of the attorneys for the defendants, and upon a statement of Detective Dreachslin, the bond of Pallister and Krugman will be reduced to $2,000—cash or surety. The amount of bond on Mr. Flieger will be continued. In setting the bond, the court feels no one has more knowledge on the background of this matter, than Detective Dreachslin."

On the record it clearly appears, without dispute, both from the testimony of Pallister and his attorney, that Pallister and his attorney were led to believe the police would aid him in gaining something of importance to him which otherwise he might not be able to obtain, *i.e.,* a reduction of charge and a release on bond. Such intimations by the police make his confession just as involuntary as if the police had made absolute commitments. There is no room for a distinction between tacit and express understandings. See *In re Valle* (1961), 364 Mich 471, 477. We, accordingly, hold that Pallister's confession was involuntary, that he is entitled to a new trial and that the confession may not be used at such new trial.

See *People* v. *Cleveland* (1930), 251 Mich 542, *People* v. *Wolcott* (1883), 51 Mich 612, and 1 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 528, p 633, for authority supporting the proposition that confessions obtained by promises which lead the defendant to believe he will get off easier by making them are inadmissible.

In the case of *State* v. *Jerry Arnold Fuqua* (1967), 269 NC 223, 227 (152 SE2d 68, 71), the court said:

"Speaking to the subject of free and voluntary confession in *State* v. *Roberts,* 12 NC 259, Henderson, J., said:

" 'Confessions are either voluntary or involuntary. They are called voluntary when made neither under the influence of hope or fear, but are attributable to that love of truth which predominates in the breath of every man, not operated upon by other motives more powerful with him, and which, it is said, in the perfectly good man cannot be countervailed. These confessions are the highest evidences of truth,

even in cases affecting life. But it is said, and said with truth, that confessions induced by hope or extorted by fear are, of all kinds of evidence, the least to be relied on, and are therefore entirely to be rejected.' "

We are also deeply bothered by what immediately followed the reading of Pallister's confession to the jury. Immediately thereafter, the court reporter who took down the confession of co-defendant Flieger identified his confession and it was marked as an exhibit. Mr. Hull, representing Flieger but not Pallister, who was represented at the trial by a Mr. Wilson, stated that he would object to the admission on the ground of lack of voluntariness, but, in light of the court's ruling on the previous transcript, he would not ask for a *"voir dire"* at that time, reserving the right to offer testimony. The court then admonished the jury that Flieger's confession could not be considered as evidence against Dorothy Krugman or Marvin Pallister, and the statement was thereupon read without objection. Immediately upon conclusion of the reading of that confession, officer Dreachslin was briefly examined on one matter and Detective Olepa (one of the officers alleged to have made a commitment to Pallister) was examined, but no questions were put to them by the prosecutor with regard to Pallister's allegations. That testimony was all very brief, indeed. Immediately upon its conclusion, and, thus, following within a very short time of the reading of Flieger's confession, this appears in the record:

*Mr. Barry* [*assistant prosecutor*] : "At this time, your honor, we have a matter or two which might better be taken up in the absence of the jury."

The jury was then excused and certain formalities, including the waiver of certain endorsed witnesses, were attended to. Then Mr. Barry announced:

"Now, with the permission of the court, with respect to respondent Gerard Flieger, the people will move to add a second count to the information with respect only to that respondent, of assault with intent to commit—to rob being armed, under Act 328 of the Public Acts of 1931."

Mr. Wilson for the defendant Pallister stated that he had no objection, and Flieger then pleaded guilty.

No error is assigned, but it seems to us completely indefensible for the prosecutor to read the confession of a co-defendant which mentions the names of other co-defendants within a very short time prior to allowing the confession-writing defendant to plead guilty to a lesser charge. There could have been no reason for the delay in allowing Flieger to plead guilty other than to put before the jury evidence of his confession, which the prosecutor well knew could not be introduced had Flieger been allowed to plead guilty earlier in the trial. The prosecutor did not hesitate to mention Flieger's confession to the jury:

"These statements are fine, so far as they go. Here's the statement of Marvin Pallister. This statement of Pallister, as the court will instruct you, the judge will tell you, is only to be considered by you with respect to Marvin Pallister. The statement of Gerard Flieger, if the court allows this statement to go to you, will be considered by you only as to Mr. Flieger."

That occurred at a time well after Mr. Flieger was out of the case altogether.

Although no error is assigned on this ground, we think the procedures followed are so fundamentally unfair as to justify a new trial on that ground alone.

See *People* v. *Gonzales, et al.* (1902), 136 Cal 666 (69 P 487).

Reversed and remanded for a new trial.

LESINSKI, P. J., and LEVIN, J., concurred.